UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                  :

JEFFREY HOFSOMMER,

                                  :       <u>OPINION AND ORDER</u>

              Plaintiff,

                                  :       17 Civ. 4745 (GWG)

              -v.-

                                  :

NANCY A. BERRYHILL,               :

                Defendant.        :
-----------------------------------------------------------------X

GABRIEL W. GORENSTEIN, United States Magistrate Judge:

      Plaintiff Jeffrey Hofsommer brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security ("Commissioner") denying

his claim for disability benefits under the Social Security Act (the "Act"). Both parties have

moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[1] For

the reasons stated below, Hofsommer's motion is granted and the Commissioner's motion is

denied.

---

[1] See Plaintiff's Notice of Motion for Judgment on the Pleadings, filed Jan. 2, 2018
(Docket # 13); Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on
the Administrative Record and Pleadings Pursuant to Rule 12(c) F.R.C.P., filed Jan. 2, 2018
(Docket # 14) ("Pl. Mem."); Commissioner's Notice of Motion, filed Mar. 2, 2018 (Docket
# 18); Commissioner's Memorandum of Law in Support of Defendant's Motion for Judgment on
the Pleadings, filed Mar. 2, 2018 (Docket # 19) ("Comm'r Mem."); Plaintiff's Reply
Memorandum of Law in Opposition to Defendant's Cross-Motion and in Further Support of
Plaintiff's Motion for Judgment on the Administrative Record and Pleadings Pursuant to Rule
12(c) F.R.C.P., filed Mar. 20, 2018 (Docket # 20) ("Pl. Reply").

I. BACKGROUND

A. Procedural History

Hofsommer applied for Disability Insurance benefits and Supplemental Security Income on March 10, 2014. See Certified Administrative Record, filed Nov. 1, 2017 (Docket # 11) ("R."), 26. The Social Security Administration ("SSA") denied Hofsommer's applications and Hofsommer sought review by an Administrative Law Judge ("ALJ"). R. 178-85. A hearing was held on December 15, 2015, at which Hofsommer and his attorney appeared. R. 108-170. In a written decision dated February 3, 2016, the ALJ found that Hofsommer was not disabled. R. 23-40. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. R. 1-6. Hofsommer filed this action on June 22, 2017, seeking review of that final decision. See Complaint, filed June 22, 2017 (Docket # 1).

B. The Hearing Before the ALJ

Hofsommer was represented by attorney Gary Gogerty at the hearing before the ALJ. R. 110. Before calling any witness to testify, the ALJ reviewed the record, at which time Hofsommer's attorney stated that the only outstanding medical records were records pertaining to "[c]ontinuous treatment." R. 111. The ALJ then called Hofsommer to testify. R. 111.

Hofsommer was 54 years old at the time of the hearing, and had previously had two shoulder surgeries on his right arm. R. 112, 126. After his first surgery, Hofsommer re-injured his shoulder while helping his wheelchair-bound aunt into a car. R. 134-35. Physical therapy made his shoulder worse. R. 127-28. Hofsommer demonstrated how high he could lift his right arm for the ALJ, and the ALJ described it as being "a little bit above [his] waist." R. 128.

Hofsommer could not dial on a phone with his right hand because doing so caused him shooting pain up to his neck. R. 129. He described the pain as a sharp pain that runs from the

2

tip of his shoulder to his fingers and neck, and said it was usually a nine to ten on a ten point

scale. R. 143-44. He had received medical opinions from several doctors, who had said that he

needed a total shoulder replacement and would have to wait until he was 62 to get one. R. 126-

27. The doctors had told him that he was "too young and too active" to have another surgery

earlier than that, but when the ALJ asked what the doctors meant by "too active," he said "I

don't know. I asked them the same thing and they never answer me." R. 139.

To treat his shoulder, Hofsommer took muscle relaxers and Ambien to help him sleep.

R. 127. Hofsommer testified that although he had previously been prescribed narcotic pain

medication, the doctor who had prescribed that medication to Hofsommer had stopped doing so

after finding that Hofsommer's urine tested positive for marijuana. R. 129-32. He no longer

used marijuana, and drank a couple of beers "[m]aybe once a week." R. 132-33. Although the

ALJ stated a medical report indicated that in November 2015, Hofsommer had been admitted to

an emergency room and had been found to have a blood alcohol content of .243, Hofsommer

denied any recollection of being tested and found to have that blood alcohol content. R. 133-34.

Regarding his work history and vocational experience, Hofsommer testified that other

than occasionally watching an elderly friend of his for $50 "every week or two weeks" during

the summer of 2015, he had not worked in any capacity since January of 2011. R. 111-13, 115.

In 2006 and 2007, he worked for Breckenridge Enterprises in Florida, where he did "stone block

work." R. 123-24. In 2000, he worked for "Hansen Pipe Products and Pre-Cast," where he

smoothed concrete after it was poured. R. 124-25. He also worked as a construction worker in

1998 for a company called "PT Florida Incorporated," where he helped build high rise buildings.

R. 148-49. Hofsommer had completed ninth grade, though he was enrolled in some special

education classes when he attended school, and at the time of the hearing, he was illiterate. R.

117, 122-23.  Hofsommer went to "Job Corps" for two years when he was 15 or 16.  R. 117.

Concerning daily activities, Hofsommer stayed at home with his mother, with whom he lived.  R. 118.  Hofsommer's mother had previously had "a couple [of] heart attacks," and Hofsommer had moved back to New York from Florida in 2011 to take care of her.  R. 119, 123.  To help his mother, Hofsommer would "take out the trash . . . vacuum floors" and would also assist her with cooking, cleaning, setting the table, and doing laundry.  R. 119.  Hofsommer was capable of using a riding lawnmower to mow his mother's lawn, though his brother often helped with work outside of the home.  R. 120.  Hofsommer could not lift anything with his right arm, though he would occasionally put one log at a time into his mother's fireplace using his left hand, with each log weighing "[m]aybe five pounds or something like that."  R. 121.  Hofsommer also stayed with his aunt every other week around 2011 or 2012 to help her with activities such as "putting her clothes in the wash and making sure her garbage and stuff was all taken out," and also "clean[ing] up her room."  R. 135-36.  Hofsommer had no driver's license because he lost it approximately eleven years prior to the hearing as a result of a "DUI."  R. 116-17.

The ALJ called Josiah Pearson, a vocational expert witness ("VE").  R. 145.  Using the Dictionary of Occupational Titles ("DOT"), the VE classified Hofsommer's prior work with PT Florida and Breckenridge as "construction worker II," which was an unskilled job requiring a very heavy level of exertion, and the job at Hammond as a "laborer at a concrete plant," an unskilled job with a heavy exertion level.  R. 150-51.

The ALJ asked VE Pearson to assume a hypothetical person of Hofsommer's age, education, and work history, with the residual functional capacity ("RFC") to engage in a full range of light exertional work as defined in the DOT, but without the ability to reach overhead

4

with his dominant right upper extremity, and with the ability to occasionally reach in all other directions with that extremity. R. 151. The VE testified that such a person could perform jobs that existed in substantial numbers in the national economy, including as an usher, school bus monitor, cashier II, or counter clerk. R. 152-53. The ALJ additionally asked whether any jobs would exist in the national economy that the hypothetical person could perform if he could not reach in any direction with the dominant right upper extremity but could occasionally handle and finger with that extremity. R. 153-54. The VE testified that such a person could perform the jobs already listed even with this additional restriction. R. 154.

C. Medical Evidence

Both Hofsommer and the Commissioner have provided summaries of the medical evidence contained in the administrative record. See Pl. Mem. at 4-14; Comm'r Mem. at 1-10. The Court had directed the parties to specify any objections they had to the opposing party's summary of the record. See Scheduling Order, filed Nov. 3, 2017 (Docket # 12), ¶ 5. Neither party specified any objections, and the summaries are substantially consistent with each other. Accordingly, the Court adopts Hofsommer's and the Commissioner's summaries of the medical evidence as accurate and complete for purposes of the issues raised in this suit. We discuss the medical evidence pertinent to the adjudication of this case in section III below.

D. The ALJ's Decision

The ALJ denied Hofsommer's application for benefits on February 3, 2016. R. 39-40. The ALJ found that Hofsommer met the insured status requirements of the Act through June 30, 2011, and that he had not engaged in substantial gainful activity since January 1, 2011, the alleged onset date. R. 28. The ALJ found that Hofsommer had severe impairments of "right shoulder rotator cuff tear; osteoarthritis of the right shoulder; cervical spine degenerative disc

disease and spondylosis; tremor; and hypertension." R. 28. He found, however, that

Hofsommer had no impairment or combination of impairments that met or medically equaled

"the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R.

29.

     As for Hofsommer's RFC, the ALJ determined that he could "perform light work as

defined in 20 CFR 404.1567(b) and 416.967(b) except no reaching with the dominant right upper

extremity, and he can occasionally handle and finger with the right upper extremity." R. 30. In

making this finding, the ALJ considered Hofsommer's "longstanding treatment record at Crystal

Run Healthcare beginning prior to the alleged onset date to the present." R. 30. The ALJ also

evaluated a Disability Questionnaire dated June 23, 2014, that had been submitted by Dr. Rocco

Bassora, plaintiff's orthopedic surgeon; three opinion letters from Dr. Bassora dated February 3,

2014, November 20, 2014, and January 26, 2015; and a Disability Questionnaire dated April 7,

2014, from Dr. Towhid Shiblee, Hofsommer's internist, R. 30, 32, 35-36. The ALJ gave

"[s]ome weight" to Dr. Bassora's "overall opinion," which included a statement in the June 23,

2014 Disability Questionnaire indicating that Hofsommer could

> never lift or carry, . . . is unable to work with his right shoulder and arm. . . . [Has]
> marked limitation in using arms for reaching (including overhead); moderate limitation in
> grasping, turning, twisting objects with bilateral upper extremities; and minimal
> limitation using fingers and hands for fine manipulations with bilateral upper
> extremities. . . . [C]ould not tolerate low stress work due to severe right shoulder pain,
> . . . was limited to no pushing, pulling, and bending. . . . [And] has psychological
> limitations.

R. 35-36 (citations omitted). In so doing, the ALJ noted that Dr. Bassora was an orthopedic

surgeon. R. 36. The ALJ gave "great weight" to the portion of the opinion stating that

Hofsommer had "no limits to sitting standing and walking," but noted that "[t]he opinions

regarding time off task, pain, fatigue, capable of stress, and missing time from work are poorly

supported by [Dr. Bassora's] own medical records." R. 36. The ALJ also noted that he gave

"some weight" to Dr Bassora's statement that Hofsommer had "moderate limits grasping,

minimal fingering and marked in using arms for reaching," but that Dr. Bassora had "explained

the reaching earlier as limited to reaching overhead." R. 36.

> The ALJ gave "little weight" to Dr. Shiblee's opinion that Hofsommer
>
> experienced pain and fatigue at a level of 10, indicating severe. . . . [W]as unable to
> work . . . [H]ad marked limitation in [his right upper extremity in] grasping, turning,
> twisting objects; using fingers and hands for fine manipulations; and using arms for
> reaching, including overhead. . . . [W]as incapable of tolerating low work stress due to
> severe right shoulder pain, . . . needed to avoid temperature extremes, and . . . pushing
> and pulling. . . . [And] had not worked for two years.

R. 35-36 (citations omitted). The ALJ noted that Dr. Shiblee was not an orthopedic expert, his

findings "were contrary to his physical exams," and "his opinions are poorly supported by

substantial evidence including his own exams, which failed to support his own assessments." R.

36 (citation omitted).

As to Hofsommer's credibility, the ALJ found that his "medically determinable

impairments could reasonably be expected to cause the alleged symptoms," but that his

"statements concerning the intensity, persistence and limiting effects of these symptoms [were]

not wholly credible." R. 36.

In conclusion, the ALJ found that a person of Hofsommer's RFC could not perform

Hofsommer's past work as a "Laborer" or "Construction worker II." R. 37. However, relying

on the VE's testimony and Hofsommer's RFC as described above, the ALJ found that "there are

jobs that exist in significant numbers in the national economy that the claimant can perform,"

including "[u]sher . . . [s]chool bus monitor . . . [c]ashier II . . . [and] [c]ounter [c]lerk." R. 38-

39. Accordingly, the ALJ found Hofsommer not disabled from January 1, 2011, through the

date of the decision.  R. 39-40.

## II.  GOVERNING LAW

### A.  Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial

evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted). Importantly, it is not a reviewing court's function "to determine de novo whether [a claimant] is disabled." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).

B. Standard Governing Evaluation of Disability Claims by the Agency

The Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience." <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted); <u>accord</u> <u>Brown v. Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); <u>Craig v. Comm'r of Soc. Sec.</u>, 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. <u>See</u> 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>see also</u> <u>Burgess</u>, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c). Third, if the claimant's impairment is severe and is listed in 20 C.F.R. part 404, subpart P, appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience. <u>See</u> 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her age, education, and work experience, permits the claimant to do other work. 20 C.F.R.

§§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot perform other work, he or she

will be deemed disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The claimant bears

the burden of proof on all steps except the final one — that is, proving that there is other work

the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.  DISCUSSION

Hofsommer argues that the ALJ committed error by failing to develop the record to

resolve alleged inconsistencies between Dr. Bassora's opinion and medical records, by failing to

properly assess Hofsommer's credibility and subjective complaints of pain, by improperly

assessing Hofsommer's RFC, thereby rendering the VE's testimony in response to that RFC

deficient, and by failing to provide "good reasons" for not affording "controlling weight" to the

opinion of Dr. Bassora, see Pl. Mem. at 14-27.  We discuss each of these issues in turn.

A.  Development of the Record

When an ALJ assesses a claimant's alleged disability, an ALJ must develop the

claimant's medical history "for at least the 12 months preceding the month in which" the

claimant filed his application.  20 C.F.R. §§ 404.1512(d), 416.912(d).  The governing statute

provides that the ALJ "shall make every reasonable effort to obtain from the individual's treating

physician (or other treating health care provider) all medical evidence, including diagnostic tests,

necessary in order to properly make" the disability determination.  42 U.S.C. § 423(d)(5)(B);

accord 20 C.F.R. §§ 404.1512(d), 416.912(d).  "Nevertheless, the Second Circuit has held that it

is not per se error for an ALJ to make a disability determination without having sought the

opinion of the claimant's treating physician."  Sanchez v. Colvin, 2015 WL 736102, at *5

(S.D.N.Y. Feb. 20, 2015) (citing Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 33-34 (2d

Cir. 2013) (summary order), and Pellam v. Astrue, 508 F. App'x 87, 90 (2d Cir. 2013) (summary

order)).  This is particularly true where "the ALJ . . . had all of the treatment notes from [the claimant's] treating physicians," Pellam, 508 F. App'x at 90, and where the rest of the record, "contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]," Tankisi, 521 F. App'x at 34.  By contrast, where the medical record is not voluminous and contains no assessment of the claimant's limitations from a treating physician, further development may be required.  Cf. Sanchez, 2015 WL 736102, at *6 (Given the "voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ, we hold that it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity.").

The ALJ's duty to develop the record remains the same regardless of whether the claimant is represented by counsel.  Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citing Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996)).

The ALJ in Hofsommer's case took adequate steps to further develop the record. Specifically, the ALJ made a request to Dr. Bassora to clarify his opinion and Dr. Bassora failed to respond.  R. 36, 261-65.  Although Hofsommer argues that SSA regulations required the ALJ to make a follow-up request after Hofsommer failed to respond to the initial request, see Pl. Mem. at 17, the regulations to which Hofsommer cites are applicable to an ALJ's duty to develop a claimant's medical history for at least the 12 months prior to the month in which the claimant files his application.  See 20 C.F.R. §§ 404.1512(d)(1)-(2), 416.912(d)(1)-(2).  By contrast, the regulations applicable to recontacting a treating physician to resolve an inconsistency give an ALJ discretion as to whether to do so.  See 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1) (using the term "may").  The regulations lack the explicit requirement, contained in the regulations to which Hofsommer cites, that an ALJ must recontact the treating physician

in case that physician fails to respond.  Accordingly, the ALJ was not required to recontact Dr.

Bassora here when Dr. Bassora failed to respond to the ALJ's request seeking clarification of Dr.

Bassora's opinion.

In any event, the ALJ did not have a duty to develop the record any further in the first

place.  SSA regulations provide that "[i]f any of the evidence in your case record, including any

medical opinion(s), is inconsistent, we will weigh the relevant evidence and see whether we can

determine whether you are disabled based on the evidence we have."  20 C.F.R.

§§ 404.1520b(b), 416.920b(b).[2]  Any recontacting of a medical source is to occur only if the ALJ

"cannot reach a conclusion about whether you are disabled."  20 C.F.R. §§ 404.1520b(c),

416.920b(c).  As a result, "even where there is an internal inconsistency in a treating source's

opinions and notes, no duty to develop arises when the record is otherwise complete."  Hansen v.

Berryhill, 2018 WL 910501, at *11 (citing Brown v. Comm'r of Soc. Sec., 2014 WL 783565, at

*17 (S.D.N.Y. Feb. 28, 2014)).  This approach accords with Second Circuit precedent, which has

held that "where there are no obvious gaps in the administrative record, and where the ALJ

already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional

information in advance of rejecting a benefits claim."  Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d

---

[2]  Prior to 2012 amendments to 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1), these regulations provided that an ALJ "will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved."  20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) (effective June 13, 2011 to March 25, 2012); see also Walker v. Colvin, 2013 WL 5487443, at *3 (W.D.N.Y. Sept. 30, 2013) (citing 20 C.F.R. § 1512(e) and noting that ALJ had an affirmative duty to develop the record to resolve an inconsistency in a treating physician's opinion).  This requirement was removed from the regulations in 2012, in part "to give adjudicators more flexibility in determining when and how to obtain information from medical sources to resolve an inconsistency or insufficiency in the evidence."  Gabrielsen v. Colvin, 2015 WL 4597548, at *5 (S.D.N.Y. July 30, 2015) (internal quotation marks omitted).

Cir. 1999) (quoting Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996)).[3]  Here, Hofsommer has not

pointed to any gaps in the administrative record.  Instead, he argues that the "inconsistency or

insufficiency" of the record in supporting Dr. Bassora's opinion required the ALJ to recontact

Dr. Bassora.  As noted, this does not trigger the duty to further develop the record.

B. Credibility

Hofsommer argues that the ALJ failed to properly assess Hofsommer's credibility and

take into account his subject complaints of pain.  Pl. Mem. at 18-25.

1. Governing Law

"It is the function of the [Commissioner], not [the reviewing court], to resolve

evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."

Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citations omitted).

Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other

indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the

degree of impairment."  Tejada, 167 F.3d at 776 (summarizing and citing with approval a

holding in Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)).  Nonetheless,

when discounting a claimant's credibility regarding his RFC, regulations impose some burden on

the ALJ to explain his decision.  As the Second Circuit has stated:

> [w]hen determining a claimant's RFC, the ALJ is required to take the claimant's
> reports of . . . limitations into account, 20 C.F.R. § 416.929; see McLaughlin v.
> Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980), but is not
> required to accept the claimant's subjective complaints without question; he may
> exercise discretion in weighing the credibility of the claimant's testimony in light

---

[3]  As noted in Hansen, we do not read cases such as Rolon v. Commissioner of Social
Security, 994 F. Supp. 2d 496 (S.D.N.Y. 2014), cited by Hofsommer, "as requiring an ALJ to
recontact a claimant's treating physician whenever the ALJ finds an internal inconsistency in the
source's reports or notes."  Hansen, 2018 WL 910501, at *11.

of the other evidence in the record.  Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

Genier, 606 F.3d at 49.  To evaluate a claimant's assertion of a limitation, the ALJ must engage in a two-step process:

> [a]t the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  20 C.F.R. § 404.1529(b). . . .  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record.  Id.  The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings."  20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

Id. (alterations in original).

The SSA has issued regulations relating to reports of pain or other symptoms affecting the ability to work by a claimant for disability benefits.  20 C.F.R. §§ 404.1529(c), 416.929(c).  These regulations provide, inter alia, that the SSA "will not reject [a claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work . . . solely because the available objective medical evidence does not substantiate [his] statements."  20 C.F.R. § 416.929(c)(2) (emphasis added); accord 20 C.F.R. § 404.1529(c)(2).  The regulations also provide that the SSA "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [his] statements and the rest of the evidence."  20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

Where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the

record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing

Carroll, 705 F.2d at 643); accord Puente v. Comm'r of Soc. Sec., 130 F. Supp. 3d 881, 894

(S.D.N.Y. 2015). The ALJ must make this determination "in light of medical findings and other

evidence[] regarding the true extent of the pain alleged by the claimant." Mimms v. Heckler,

750 F.2d 180, 186 (2d Cir. 1984) (citation and internal quotation marks omitted). However,

where an ALJ gives specific reasons for finding the claimant not credible, the ALJ's credibility

determination "is generally entitled to deference on appeal." Selian, 708 F.3d at 420 (citation

omitted). Thus, "[i]f the [Commissioner's] findings are supported by substantial evidence, the

court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain."

Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (citations

omitted); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as

to any fact, if supported by substantial evidence, shall be conclusive . . . .").

2. Analysis

Hofsommer takes issue with the following portion of the ALJ's decision:

First, the claimant has described daily activities that are not limited to the extent one
would expect, given the complaints of disabling symptoms and limitations. The claimant
testified to moving up to the area so that he could take care of his mother. He reported
helping her with a range of activities of daily living from laundry, taking out the trash,
setting the table, to vacuuming. In addition, the claimant testified to helping take care of
his ailing aunt while she was sick in 2011 and 2012 and staying with her every other
week and helping her with a range of activities. Finally, the claimant reported that he
was hired to take care of his 82 year old friend a few hours a day a couple of times a
week and was paid $50 a week, but when asked to describe when, where and how often
he was doing this work he was extremely vague and failed to provide any concrete
information, which impacts on the claimant's veracity. These activities all provide
support for the residual functional capacity.

R. 36-37. Hofsommer argues that the ALJ inaccurately described Hofsommer's daily activities

when assessing his credibility.

We reject this argument because the ALJ's description accords with Hofsommer's testimony at the hearing before the ALJ. During this hearing, Hofsommer testified that he "moved back up here from Florida to take care of" his mother, that he helped his mother take out laundry and "put it in the basket and kick it over with my foot to the dryer for her," that he "take[s] out the trash and . . . tr[ies] to vacuum floors or something," and that he "tr[ies] to set the table and stuff for her and clean it off." R. 119. Likewise, Hofsommer also testified that in 2011 and 2012, he stayed with his aunt "[j]ust like every other week or something" and helped her by "putting her clothes in the wash and making sure her garbage and stuff was all taken out," and also cleaned her room. R. 135-36. Finally, Hofsommer initially testified that he watched over his 82-year-old friend "like two, three hours a day" and in exchange was given "like $50 like every week or every two weeks or whenever." R. 112-14. After further questioning by the ALJ however, Hofsommer recharacterized this arrangement by stating that he "just stopped there every once in awhile just to see how [his friend] was doing," that he would watch his friend "if [his friend's wife] had to go somewhere," that he did not know how many times a week he went to his friend's house, and that his friend's wife paid him $50 "just because she knew I couldn't work or nothing." R. 115-16. Thus, the ALJ properly described this arrangement (with the minor exception that Hofsommer did not testify to watching over his friend "a couple of times a week"), and Hofsommer's vague responses upon further questioning about this arrangement. Hofsommer's assertion that the ALJ misstated his testimony as described above is incorrect.

Hofsommer also argues that "the ALJ does not specify which of [Mr. Hofsommer's] alleged limitations are contradicted by [his] daily activities." Pl. Mem. at 20-21 (alteration in original) (internal quotation marks omitted) (citing Oomen v. Berryhill, 2017 WL 1386355, at *15 (S.D.N.Y. Apr. 17, 2017), and Pena v. Astrue, 2008 WL 5111317, at *12 (S.D.N.Y. Dec. 3,

2008)).  However, elsewhere in the ALJ's opinion, the ALJ specifically notes that "the claimant's testimony that he could not use his arm in any capacity is not well supported by . . . his activities of daily living."  R. 37.[4]

Hofsommer asserts that the ALJ improperly characterized his work history prior to the alleged onset of his disability as "sporadic," and speculatively noted that this "raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments."  Pl. Mem. at 23 (quoting R. 37).  Hofsommer counters the assertion that his work history was "sporadic" by noting that he "worked every year from 1980 through 2009 with the exception of two (2) years, 1985 and 2003."  Id.  Hofsommer does not support this argument with a citation to the record corroborating his work history.  Moreover, Hofsommer's earnings for many of these years was very low, suggesting that he in fact engaged in only sporadic work.  He earned under $15,000 for every year starting with the beginning of his work history in 1980 through 2005, and in many years earned far lower amounts, including in years during the five year period before his alleged disability onset date of 2011.  See R. 236 ($2,868 in 1994, $1,291.50 in 1996, $6,145.75 in 1997, $1,952.00 in 1999, $7,786.02 in 2001, zero earnings in 2003, $572 in 2004, $2,030.83 in 2005, $5,561.13 in 2008, and $1,054 in 2009).  Moreover, Hofsommer's sporadic work history was properly considered by the ALJ in discounting Hofsommer's crediblity.  See Schaal, 134 F.3d at 502 ("ALJs are specifically instructed that credibility determinations should take

_____

[4]  Hofsommer argues that the ALJ incorrectly stated that, after Hofsommer testified that his doctors did not approve him for a third shoulder replacement surgery because he was "too active," Hofsommer's response to "what the doctors meant by being . . . too active" was vague.  Pl. Mem. at 21 (citing R. 37).  But the record indicates that Hofsommer was asked twice what his doctors meant by "too active," and that he responded that he did not know both times.  R. 139.  Hofsommer also said that he told his doctors that he "help[ed] his mom around the house."  R. 140.  We thus accept that Hofsommer's testimony that he did not know can fairly be characterized as vague.

account of 'prior work record.' . . . [J]ust as a good work history may be deemed probative of credibility, a poor work history can reasonably be deemed to have the opposite significance.") (citations omitted).

Finally, Hofsommer argues that the ALJ incorrectly found that Hofsommer's range of motion in his right shoulder "at times was over shoulder level." Pl. Mem. at 23-24 (citing R. 37). In particular, Hofsommer asserts that the medical records the ALJ cites for this proposition do not so say. Id. at 24. This is incorrect. For example, in support of this conclusion, the ALJ cited to an August 15, 2012 post-operative report signed by Dr. Bassora, which noted that after Hofsommer's surgery on June 12, 2012, Hofsommer was "in physical therapy working on aggressive [range of motion]," that Hofsommer had a "[frontal flexion] 150 active and 160 passive with pain," and that Hofsommer "continues to improve his [range of motion]." R. 774-75. Another post-operative report dated February 13, 2013, from Dr. Bassora, provided that although Hofsommer "continue[d] to experience pain in his shoulder with difficulty with overhead activities," he still maintained "[frontal flexion] 100 active and 160 passive with pain."[5] R. 814-15. Furthermore, a September 26, 2013 consultation performed by Dr. Howard Yeon, MD, noted in the section labeled "Physical Exam" that Hofsommer had "[f]lexion/extension and side bending [range of motion] within normal limits." R. 864. Finally, another consultation performed by Dr. Yeon on November 6, 2013, noted in the section marked "Physical Exam" that Hofsommer had "[f]orward flexion 120 active, 140 passive." R. 878. The Commissioner notes that these reports show that Hofsommer could move his arm above shoulder

---

[5] Hofsommer notes that in this report, Dr. Bassora stated that Hofsommer was unable "to fully raise his arm." R. 815. Of course, the inability to fully raise his arm does not necessarily mean that Hofsommer was unable to raise his arm above his shoulder. Indeed, Dr. Bassora found that he could, as noted by the ALJ.

level insofar as his forward flexion range of motion exceeded 90 degrees, <u>see</u> Comm'r Mem. at 24, and Hofsommer does not dispute this assertion in his reply brief.

Based on the above, we reject Hofsommer's arguments that the ALJ's credibility determination was unsupported by substantial evidence.

C.  <u>Hofsommer's RFC and the VE's Testimony</u>

Hofsommer argues that the ALJ failed to properly assess his RFC, and as a result the hypotheticals posed to the VE were not supported by substantial evidence, and the VE's responses to those hypotheticals must thus be rejected.  Pl. Mem. at 25-27.  "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence, and accurately reflect the limitations and capabilities of the claimant involved."  <u>Calabrese v. Astrue</u>, 358 F. App'x 274, 276 (2d Cir. 2009) (summary order) (citation omitted).  Thus, we focus our analysis on whether the ALJ's RFC determination was supported by substantial evidence.  If it was not, then the ALJ's reliance on the VE's testimony in response to that RFC was also improper.  <u>Cf.</u> <u>id.</u>

A claimant's RFC is "the most [a claimant] can still do despite [their] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC is a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."  SSR 96-8P, 1996 WL 374184 (S.S.A. July 2, 1996).  The SSA has stated that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . .  Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."  <u>Id.</u>; <u>accord</u> <u>Ferraris v. Heckler</u>, 728 F.2d 582, 585 (2d Cir. 1984) ("[I]n making any determination as to a claimant's disability, the Secretary must explain what physical functions

the claimant is capable of performing."). Nonetheless, the Second Circuit has held that

> [w]here an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, . . . remand is not necessary merely because an explicit function-by-function analysis was not performed.

Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam); accord Cruz v. Astrue, 941 F. Supp. 2d 483, 498 (S.D.N.Y. 2013).

Here, we cannot conclude that the ALJ adequately explained his RFC determination. After discussing the relevant medical evidence, the ALJ found that Hofsommer retained the RFC to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no reaching with the dominant right upper extremity, and he can occasionally handle and finger with the right upper extremity." R. 30. Under the cited regulations, light work is defined as "involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [And] requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b). Implicit in the ALJ's conclusion, therefore, was the finding that Hofsommer could lift up to 20 pounds occasionally, could frequently lift or carry objects weighing up to 10 pounds, and could do some pushing and pulling of arm or leg controls. Notwithstanding this implicit finding, the ALJ does not directly explain what evidence supports this implicit finding.

As for the evidence the ALJ reviewed, the ALJ pointed to Dr. Bassora's opinion, which reported that Hofsommer had "no limits to sitting standing and walking," and "moderate limits grasping, minimal fingering and marked in using arms for reaching." R. 36, 592-93. However, Dr. Bassora's opinion also reported that Hofsommer could not push, pull, lift, or carry at all. R.

592, 596.  Although the ALJ recognized that Dr. Bassora made this finding, R. 35, the ALJ

failed to indicate what weight this statement carried.  If he accepted it, he failed to reconcile this

opinion with Hofsommer's alleged capacity for light work requiring these abilities.  R. 35-36.

Instead, the ALJ simply stated that Dr. Bassora's responses to the Disability Questionnaire

"provide[] support for the" RFC and gave "[s]ome weight . . . to Dr. Bassora's overall opinion."

R. 36.  Assuming that the portion of Dr. Bassora's opinion stating that Hofsommer could not

push, pull, lift, or carry was also given "some weight," then the ALJ should have explained why

such restrictions did not further impede Hofsommer's ability to perform light work.  On the

other hand, if the ALJ provided little or no weight to these restrictions, then the ALJ should have

explained his reason for doing so.

     We recognize that the ALJ also noted that his RFC determination was supported by the

activities of daily living in which Hofsommer still engaged, including helping his mother with "a

range of activities of daily living from laundry, taking out the trash, setting the table, to

vacuuming. . . .  [T]ak[ing] care of his ailing aunt while she was sick in 2011 and 2012 and

staying with her every other week and helping her with a range of activities. . . .  [And] tak[ing]

care of his 82 year old friend a few hours a day a couple of times a week."  R. 36.  However, the

ALJ never directly states that these activities demonstrated that Hofsommer could "frequent[ly]

lift[] or carry[] . . . objects weighing up to 10 pounds," could sometimes lift up to 20 pounds, or

could push and pull as required to perform light work.  20 C.F.R. §§ 404.1567(b), 416.967(b).

Indeed, Hofsommer testified that when helping his mother with laundry, he would kick the full

basket of laundry to her instead of lifting it, R. 119, 137, and that although he would

occasionally lift logs and place them in a fireplace for his mother, he would do so by putting one

log in at a time, each log weighing "[m]aybe five pounds," R. 121.  Given this testimony, we

cannot say that the ALJ's analysis "affords an adequate basis for meaningful judicial review," Cichocki, 729 F.3d at 177, such that we could determine that he properly found that Hofsommer could lift, carry, push, or pull within the meaning of the regulation.

This case is similar to Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984), in which the ALJ had found that the claimant could perform sedentary work based on the ALJ's findings that the claimant "could not do any prolonged standing or frequent lifting of more than 10 pounds." Id. at 586 (emphasis omitted). The Second Circuit noted that the claimant's "ability to sit for prolonged periods of time was the key to the ultimate determination of his disability," and had been the subject of varying opinions by the claimant's consulting and treating physicians, and that the ALJ failed to make an adequate determination on whether the claimant retained the ability to sit. Id. at 586-87. Accordingly, Ferraris held that "[o]n the basis of the ALJ's insufficient findings here, we cannot determine whether his conclusory statement that [the claimant] could carry out sedentary work is supported by substantial evidence." Id. at 587. Similarly here, the ALJ conclusorily determined that Hofsommer was capable of light work, and noted that Hofsommer's treating physician found no limitations in Hofsommer's ability to sit, stand, or walk. R. 30, 36. The ALJ, however, failed to discuss how the evidence established that Hofsommer could push, pull, carry, or lift as required to perform light work per the regulations' definition, despite the fact that a treating source's opinion on which the ALJ relied noted that Hofsommer could not perform these functions. See R. 36. These functions were more important in this case than Hofsommer's ability to sit, stand, or walk, given that Hofsommer's alleged disability arose from a shoulder injury. Thus, the ALJ's conclusory finding that Hofsommer could perform light work as defined in the SSA regulations was not supported by substantial evidence.

We reiterate that an express "function-by-function" assessment of a claimant's RFC is not required, so long as the ALJ "explain[s] how the evidence supports his or her conclusions about the claimant's limitations and . . . discuss[es] the claimant's ability to perform sustained work activities." Casino-Ortiz v. Astrue, 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007) (citation and internal quotation marks omitted). However, the ALJ failed to do so here. This oversight was particularly critical because the opinion evidence upon which the ALJ relied in crafting his RFC determination specifically noted that Hofsommer lacked certain capabilities necessary to perform light work. See Ferraris, 728 F.2d at 587 ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.") (citation omitted).

In sum, the ALJ's RFC determination was not supported by substantial evidence, and as a result the ALJ was not entitled to rely on the VE's testimony in response to the ALJ's hypothetical. See Calabrese, 358 F. App'x at 276.

D. The Treating Physician Rule

Hofsommer argues that the ALJ failed to provide "good reasons," using the factors in 20 C.F.R. §§ 404.1527(c), 416.927(c), for not providing controlling weight to Dr. Bassora's opinion. Pl. Mem. at 14-16.

Under the so-called "treating physician rule," an ALJ must give "more weight to opinions" of certain treating sources when determining if the claimant is disabled, see 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); accord Lacava v. Astrue, 2012 WL 6621731, at *12 (S.D.N.Y. Nov. 27, 2012). The rule directs the agency to give "controlling weight" to a treating physician's medical opinion as to the nature and severity of a claimant's impairments if the

opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ must provide "good reasons" for the weight given to that opinion. Halloran v. Barnhart, 362 F.3d 28, 32-33 (2d Cir. 2004) (per curiam) (internal quotation marks omitted) (citing Schaal, 134 F.3d at 505); accord 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Case law holds that "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing Schaal, 134 F.3d at 505).

When an ALJ does not grant a medical opinion controlling weight under 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), then the regulations instruct the ALJ to apply a number of factors in determining what weight to grant that opinion. These factors include the "[l]ength of the treatment relationship and the frequency of examination," the "[n]ature and extent of the treatment relationship," the "[s]upportability" of the opinion with other relevant evidence, including "medical signs and laboratory findings," the "consistency" of the opinion "with the record as a whole," whether the opining physician is a specialist, and other relevant factors. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

The ALJ granted Dr. Bassora's overall opinion "[s]ome weight," and gave certain parts of Dr. Bassora's June 23, 2014 opinion "great weight," such as Dr. Bassora's opinion that Hofsommer had "no limits to sitting standing and walking." R. 36. The ALJ further noted that Dr. Bassora "reported the claimant had pain with forward elevation and that pain was precipitated with moving the shoulder overhead. . . . [And] moderate limits grasping, minimal fingering and marked in using arms for reaching." Id. The ALJ accepted these limitations given

that the ALJ's assessed RFC provided for some limitations in handling and fingering, and allowed for no reaching with the dominant right upper extremity.  R. 30.  By contrast, the ALJ afforded less weight to Dr. Bassora's opinion regarding Hofsommer's assessed limitations regarding "time off task, pain, fatigue, capable of [sic] stress, and missing time from work."  R. 36.

As to the ALJ's decision to afford less weight to this conclusion, it may be that the ALJ could have done more to explain his reasoning.  On the other hand, an ALJ is not obligated to explicitly consider each factor listed in 20 C.F.R. §§ 404.1527(c), 416.927(c), so long as the ALJ's adherence to the rule set forth in the regulations is clear.  See Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."); accord Halloran, 362 F.3d at 32-33 (upholding ALJ's decision to not afford controlling weight to the treating physician's opinion even though "it [wa]s unclear on the face of the ALJ's opinion whether the ALJ considered (or even was aware of) the applicability of the treating physician rule.").  Here the ALJ provided a single reason for rejecting Dr. Bassora's opinion: that it was "poorly supported by his own medical records."  R. 36.

We do not find it necessary to reach the question of whether the ALJ's reasoning was adequately explained in the current decision.  Given that the ALJ will be explaining or making a new determination regarding the RFC on remand, we would encourage the ALJ to provide additional explanation as to what he means when he says that certain limitations found by Dr. Bassora are poorly supported by Dr. Bassora's records, including a citation to medical records

that may actively counter the claimed limitation, if any.[6]

IV. CONCLUSION

For the reasons set forth above, Hofsommer's motion for judgment on the pleadings

(Docket # 13) is granted, the Commissioner's motion for judgment on the pleadings (Docket

# 18) is denied, and this case is remanded for further proceedings consistent with this Opinion

and Order.

SO ORDERED.

Dated: New York, New York
August 20, 2018

GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[6] We note that the assertion that Hofsommer experienced "pain" as a result of his allegedly disabling condition was supported in some of Dr. Bassora's treatment records. In a post-operative treatment record dated July 29, 2013, Dr. Bassora stated that Hofsommer "continues to experience pain in his right shoulder as well as poor function." R. 390-92. Likewise, in another record from January 27, 2014, Dr. Bassora stated that Hofsommer "continues to experience severe pain in his right shoulder." R. 340-41. Another treatment record from May 12, 2014, signed by Dr. Bassora, states that Hofsommer "continues to experience severe pain in his shoulder." R. 924-25. All of these records also noted that Hofsommer was prescribed pain medication, R. 340, 390, 924, and other records indicate that Hofsommer had seen a pain management specialist, R. 420.

27